Filed 9/18/14  P. v. Williams CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARNOLD BERNARD WILLIAMS,<br><br>    Defendant and Appellant. | B249950<br><br>(Los Angeles County<br>Super. Ct. No. YA078839) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor, Judge.  Affirmed.

Kim Malcheski, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

## INTRODUCTION

Appellant Arnold Bernard Williams challenges his second degree murder conviction on the grounds his trial attorney rendered ineffective assistance of counsel by arguing an untenable defense and by failing to move to suppress appellant's statements to police. We reject his contention, and affirm.

## FACTS AND PROCEDURE

### 1. Prosecution Evidence

On August 15, 2010, Christopher Murphy died of bleeding caused by a single gunshot wound to the back. Murphy was a known member of the Athens Park Blood gang, and was shot after entering the territory of a rival gang, the Raymond Avenue Crips. Murphy and a friend, appellant, had entered Raymond Avenue Crips territory armed with handguns. After Murphy shouted out, "What's up with y'all . . . Shotgun Crips," he and appellant fired at a group of individuals in the territory. Murphy was shot accidentally by appellant as appellant aimed at the rival gang members.

### a. The Shooting Incident

On August 15, 2010, around 12:45 p.m., C.J. and his wife and two daughters, G.J. and S.J., were driving on Berendo Avenue to their home. Berendo Avenue sloped upward from north to south. C.J. saw a group of four or five individuals standing in front of one of the buildings on Berendo Avenue. After parking in his driveway, C.J. and his daughters noticed two unfamiliar African-American males walking southbound up the Berendo Avenue slope. One was tall and skinny, the other short and fat. All three witnesses identified appellant as the tall, thin male. S.J. identified the short, fat male as Murphy.

As C.J., G.J. and S.J. unloaded groceries from the car, they heard gunshots coming from down the street. The two males then ran northbound down the slope, the skinny man in front of the fat man. C.J. saw each had a gun, one chrome and the other black. C.J. also testified that there were two incidents of shooting, but only saw the second one. In the second incident, the two males were shooting in the direction of the group of rival gang members. Around 1:40 p.m., Los Angeles County Sheriff's Deputy Reginald

Southall received a call to respond to the hospital. At the hospital, Southall searched appellant for weapons, placed him in the back seat of a patrol car, read him his Miranda rights, and asked appellant what happened. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) Appellant told Southall that Murphy had called him to pick him up on 120th Street and Denker Avenue. Appellant drove to Berendo Avenue in Murphy's white Lincoln Towncar because he knew Murphy was seeing a girl near the railroad tracks there. At Berendo Avenue, appellant heard gunshots and saw Murphy run northbound. Murphy told appellant he had been shot and asked to be driven to the hospital.

### c. The Coroner's Findings

Murphy died at the hospital. A Los Angeles County coroner conducted an autopsy and determined Murphy's cause of death to be bleeding caused by a single gunshot wound to the back. The direction of the bullet was back to front, right to left, and top to bottom. The coroner recovered one bullet from Murphy's body and placed it into evidence.

### d. Investigation

Around 1:00 p.m., Los Angeles County homicide bureau Sheriff's Deputy Sam Dendekker responded to a call on Berendo Avenue. The following evidence was recovered there: two blood samples, three .380-caliber cartridge casings, six .40-caliber cartridge casings, seven bullet fragments, an expended bullet in the trunk of a parked vehicle, and four bullet strike marks on a wrought iron fence. The six .40-caliber casings were found in a driveway and on the sidewalk, and the three .380-caliber casings were found north of those.

After responding to Berendo Avenue, Dendekker went to the hospital. There, Dendekker and a crime scene investigator for the Los Angeles Sheriff's Department searched the Towncar. On the floorboard of the driver's side rear passenger seat, they found a small silver semiautomatic handgun, a larger black semiautomatic handgun, and a red left-handed glove with an Angels logo on it. Neither handgun was loaded. Seeing appellant detained in the back of a patrol car, Dendekker opened the door and advised appellant of his rights. When asked what happened, appellant told Dendekker that he had

3

been at a location with Murphy when Murphy was shot, that he drove Murphy to the hospital in Murphy's car, and that nothing in the car belonged to appellant.

### e. Appellant's Recorded Statement to Detective Dendekker

Later that same day, Dendekker transported appellant to Los Angeles County Sheriff's Department's Lennox Station and conducted a more in-depth interview. This interview was recorded and played in court. In this interview, appellant gave three different accounts of the Berendo Avenue incident.

In the first account, appellant stated that Murphy was giving appellant a ride to fill a prescription for a friend. En route, Murphy stopped for a detour and told appellant to wait in the car and leave the engine running. Appellant thought Murphy might have been going to either see a female or to commit murder because Murphy was in his gang's enemy territory. About five to 10 minutes later, appellant heard seven or eight gunshots and Murphy came running. Murphy said he had been shot and asked appellant to drive him to the hospital.

In the second account, appellant and Murphy had been circling the area for about five minutes before they both got out of the car. Murphy yelled out, "What's up with y'all . . . Shotgun Crips." Murphy had a black gun, which he shot about six times into a group of seven or eight people. Shocked, appellant ran back to the car. At first appellant said he had no gun, then he said Murphy had given him a small silver gun. Appellant left the gun in his pocket and gave it back to Murphy when they returned to the car.

In the third account, when Murphy began to shoot, appellant jumped and the gun went off in his hand. Appellant thought he had seen someone "draw down." Appellant stated that he fired the gun probably three times, but was not shooting at the people intentionally. He stopped firing the gun because "[i]t just wasn't right," as none of the people in the group were shooting back. Appellant dropped the gun, which went off again, and took off running. Murphy came running after appellant, picking up the dropped gun on his way.

4

### f. Firearms Expert Edmund Anderson

Edmund Anderson, a Los Angeles County sheriff's deputy and firearms expert, investigated the firearms-related items in the case. Using a comparison microscope, he compared the bullet fragments and casings recovered from the Berendo Avenue address to bullets and casings he had test fired from the handguns that had been recovered from the Towncar. Anderson determined that the three .380-caliber casings had been fired from the silver handgun, and the six .40-caliber casings had been fired from the black handgun. The bullet recovered from Murphy's body and the bullet recovered from the car trunk had both been fired from the silver handgun. Anderson did not find any surface damage to the silver handgun except normal wear and tear. There was no evidence the gun was dropped on the street or sidewalk.

### g. Gang Evidence

The prosecution presented testimony from a gang expert from the Los Angeles County Sheriff's Department. He testified that gangs establish territories by making "claim[s]." Respect is an important aspect of gang culture, gained by committing crimes or by committing shootings on rival gangs. Respect can be lost by being a victim of a crime or shooting and doing nothing to retaliate.

The Athens Park Bloods are a Blood gang, commonly using the color red and the Angels logo as symbols. The Raymond Avenue Crips and the Shotgun Crips are Crip gangs. The Raymond Avenue Crips had rivalries with both the Athens Park Bloods and the Shotgun Crips.

Presented with a hypothetical based on the facts of this case, the gang expert opined that a gang's reputation would benefit if a member committed a shooting on a potential rival gang member in broad daylight. The gang would benefit even if the member shouted out the name of another gang because that would misdirect retaliation, throw off police investigations, and cause fighting among enemies. The gang would benefit even if the shooting were committed by a nonmember because the nonmember would be "putting in work."

5

## 2. *Defense Evidence*

### a. G.R.

G.R. resided on Berendo Avenue on August 15, 2010. Early in the afternoon, he saw a short, heavyset man carrying a gun in his waist and dialed 911. He heard no gunshots and no screaming. He saw two Black males run northbound past his apartment building, but only the heavyset male was carrying a gun.

### b. Firearms Expert Bruce Krell

Bruce Krell, a licensed firearms dealer and gunsmith with a Ph.D in applied mathematics, testified as a defense expert. Krell compared the bullet from Murphy to Dendekker's test-fired bullets using photos he took with a 168-200 power microscope. He used the "edge detection" function in Photoshop to do the comparison, testifying that this performed the same function as comparison microscopes. Krell concluded that the bullet from Murphy and the test-fired bullets did not necessarily come from the same firearm. Based on the diameter of the bullet from Murphy, Krell determined that it could have been shot out of any one of nine different cartridges.

Krell conducted a shooting incident reconstruction on Berendo Avenue using physical evidence and information from the investigation report. Krell placed wooden dowels into the bullet impact marks on the wrought iron fence to determine bullet trajectories. Calculating angles and distances, Krell placed the shooter of the .380-caliber handgun in front of the shooter of the .40-caliber handgun.

Based on this analysis and the downward, back-to-front angle of the bullet in Murphy, Krell concluded the shooter of the .380-caliber handgun could not have created the wound in Murphy's back.

On cross-examination, Krell stated he was self-taught in cartridge case examination, with no formal law enforcement or investigatory training. His cartridge case examination had not been subject to any kind of scientific review.

## 3. *Argument*

The prosecutor argued second degree murder under a theory of transferred intent. He argued appellant intended to kill the other gang members, but instead killed Murphy

6

by mistake or accident. Appellant's intent to kill the other gang members transferred to the shooting of Murphy. The prosecutor relied on physical evidence, appellant's recorded statement, and the unreliability of Dr. Krell's testimony to support his theory.

Defense counsel argued for complete acquittal. She argued under the theory that Murphy was not shot by appellant, but by someone else while running away from Berendo Avenue. Counsel did not argue voluntary manslaughter even though the trial court instructed the jury on that theory. She relied on Dr. Krell's testimony, physical evidence, and the unreliability of the prosecution's eyewitness testimony to support her theory.

### 4. Jury Verdict and Sentence

The jury found appellant guilty of second degree murder (Pen. Code, § 187, subd. (a)), and of three counts of attempted willful, deliberate, and premeditated murder (§§ 664, 187, subd. (a)). The jury further found the gang (§ 186.22, subd. (a)) and firearm enhancements (§ 12022.53, subds. (b)-(d)) true. Appellant was sentenced to consecutive terms of 15 years to life on the murder and attempted counts, plus 20 years under Penal Code section 12022.53. Appellant was also sentenced to concurrent terms of 15 years to life on the two remaining attempted murder counts, plus 20 years under section 12022.53.

### DISCUSSION

### 1. Applicable Law

The Sixth Amendment right to the assistance of counsel is the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) A convicted defendant claiming counsel's assistance was so ineffective as to require a reversal of conviction must show two things. First, he must show that counsel's performance was deficient, falling below an objective standard of reasonableness. (*Id.* at p. 669.) Second, he must show that the deficient performance prejudiced the defense, depriving him of a fair trial. (*Id.* at p. 687.) He must show a reasonable probability that, but for counsel's errors, the result would have been different. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.)

7

There is a presumption that counsel's performance was competent and can be explained as a matter of sound trial strategy. (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.) The reasonableness of a tactical trial decision will depend on whether it was "an informed one, that is, whether it was preceded by adequate investigation and preparation." (*In re Jones* (1996) 13 Cal.4th 552, 564-565.) A claim of ineffective assistance of counsel must be rejected if the record on appeal does not reveal why counsel acted in the manner that she did, unless the court asked for an explanation and counsel failed to provide one, or there simply could be no satisfactory explanation. Otherwise, a claim of ineffective assistance of counsel is more appropriately raised on habeas corpus.[1] (*People v. Carter, supra*, 36 Cal.4th at p. 1189.)

The right to effective assistance of counsel extends to closing argument. (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6; *People v. Diggs* (1986) 177 Cal.App.3d 958, 969.) If counsel's closing argument effectively withdrew a crucial defense and admitted her client's guilt without client's consent, closing argument may constitute ineffective assistance of counsel. (*People v. Diggs, supra*, at p. 970.)

### 2. *Appellant Was Not Deprived of His Right to the Effective Assistance of Counsel*

Appellant contends his trial counsel rendered ineffective assistance by arguing an untenable defense in closing and by failing to file a motion to suppress his statement to the police. Both arguments fail.

### a. Defense Counsel Made a Reasonable Tactical Decision to Argue Appellant Did Not Shoot the Victim

Appellant first contends defense counsel rendered ineffective assistance by arguing the untenable legal defense that appellant did not shoot Murphy. Counsel based her theory on Dr. Krell's testimony. Counsel called into question the reliability of C.J.'s testimony. She also questioned the reliability of appellant's recorded statement to

---

[1] Respondent argues appellant's claim of ineffective assistance of counsel should be dismissed because it should have been raised on habeas corpus rather than appeal. We disagree. Appellant's claim is based solely on what is contained in the record and is therefore appropriately raised on appeal.

Dendekker, arguing, "people confess all the time to crimes they don't commit." The court, however, sustained the prosecutor's objection to this line of argument as outside the evidence. Counsel argued that without the recorded statement, the prosecution lacked the evidence necessary to support a conviction. All the prosecution had was the fact that appellant was there.

Appellant contends counsel's theory was supported only by Dr. Krell's "incredible testimony." In contrast, three types of evidence contradicted her legal theory: eyewitness testimony, ballistics evidence, and appellant's recorded statement. Counsel requested the court instruct the jury on voluntary manslaughter, but instead argued for acquittal.[2] On appeal, appellant claims that by arguing for acquittal, counsel effectively withdrew a potentially meritorious defense of voluntary manslaughter. We disagree.

Here, counsel's decision to argue for acquittal did not constitute objectively unreasonable performance. At no point in the record did the trial court ask counsel why she acted in the manner that she did, and no explanation was ever given. However, the record reveals enough to provide a satisfactory explanation for counsel's trial strategy. Counsel made a reasonable tactical decision to rely on Dr. Krell's expert opinion that the shooter of the .380-caliber handgun was in front of Murphy and therefore could not have caused the gunshot wound to Murphy's back. Dr. Krell testified at length as to his credentials, experience, and methodology. Counsel's theory was further supported by G.R., who testified only Murphy had a gun. It was not unreasonable for counsel to try to

---

**2** At defense counsel's request, the court instructed the jury on voluntary manslaughter. A defendant is guilty of voluntary manslaughter "if the defendant killed someone because of a sudden quarrel or in the heat of passion." That is, "'if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than judgment.'"'" (*People v. Lasko* (2000) 23 Cal.4th 101, 108, citing *People v. Breverman* (1998) 19 Cal.4th 142, 163.) "Heat of passion . . . is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

9

use G.R.'s testimony that only Murphy had a gun to question C.J.'s testimony that appellant had been firing a gun. It is reasonable to conclude that counsel adequately investigated and prepared her trial strategy in accordance with the evidence she presented.

This conclusion is supported by the prosecution's theory of criminal liability. On count 1, the prosecutor argued second degree murder under a theory of transferred intent. Under the transferred intent doctrine, when a defendant intends to kill one person but mistakenly kills another, the intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder. (*People v. Smith* (2005) 37 Cal.4th 733, 740.) The prosecution argued that although appellant may not have intended to kill Murphy, his intent to kill the rival gang members transferred to Murphy.

Had counsel adopted a voluntary manslaughter defense, she would have run the risk that the jury would nevertheless find appellant guilty of second degree murder under the transferred intent doctrine. Overwhelming evidence supported the transferred intent theory. Appellant had accompanied his friend—a known gang member—into rival gang territory. After Murphy shouted the name of another rival gang, appellant and Murphy began firing at the rival gang members. No evidence showed anyone else at the scene was armed. Thus the evidence led directly to the conclusion appellant shot Murphy as he attempted to shoot the rival gang members. Immediately after Murphy was shot, appellant drove his friend to the hospital.

To avoid the inevitable conclusion of transferred intent, counsel elected to argue under the theory that appellant did not shoot the victim at all. To argue appellant accidentally shot his friend would have directly supported the prosecutor's theory of transferred intent. Between these two potential defenses—the one appellant now claims counsel deprived him of and the one counsel actually chose—counsel made a reasonable tactical decision to argue the one that, had the jury accepted it, would have resulted in appellant's complete acquittal.

Further, appellant fails to point to anything in the record to support the "partial defense" of voluntary manslaughter. Appellant merely points to the confession he made

10

to the police, and to Detective Dendekker's belief that appellant shot Murphy accidentally. Appellant has failed to show, however, the requisite provocation to support a heat of passion theory of voluntary manslaughter. Nothing in the record indicates either Murphy or the other victims shot at appellant or otherwise provoked him to act rashly or without due deliberation. (*People v. Lasko, supra*, 23 Cal.4th at p. 108.) Appellant even remarked in his recorded interview that he stopped shooting because the other people were not shooting at him. The record contains no evidence indicating any of the rival gang members had provoked appellant in any way, or that any of them were even armed. Likewise, there is no evidence that Murphy provoked appellant so as to obscure appellant's reason.

Defense counsel did not provide ineffective assistance by choosing to argue as she did. She made a sound tactical decision to support her argument with the testimony of the defense expert and to eschew the "partial defense" of voluntary manslaughter, for which there was little to no evidence. Because counsel's trial strategy was not deficient, appellant's first argument for ineffective assistance of counsel fails.

**b. Defense Counsel Did Not Render Ineffective Assistance by Failing to File a Motion to Exclude Appellant's Recorded Statement from Evidence**

Appellant next argues counsel rendered ineffective assistance by failing to file a motion to suppress his recorded statement to the police. In closing, defense counsel attempted to argue that appellant made a false confession. Appellant argues defense counsel had a duty to file a motion to suppress the statement. According to appellant, because counsel did not file a motion to exclude his allegedly false confession, counsel provided ineffective assistance.

Appellant's argument must fail. Contrary to appellant's protestations, counsel did in fact move to suppress appellant's statement to the police. Prior to trial, defense counsel brought an oral motion to exclude appellant's recorded statement as a violation of *Miranda*. (*Miranda v. Arizona, supra*, 384 U.S. 436.) At an Evidence Code section 402 hearing, the trial court heard testimony from Officers Dendekker and Southall about whether appellant had received his *Miranda* warnings. It was not until after the section

11

402 hearing and the ensuing discussions that the court found the statement admissible. Counsel was not ineffective in her efforts to suppress the statement.

Although appellant implicitly claims his confession was false, no evidence in the record supports that contention. In order to show defense counsel's conduct for failing to exclude the statement was deficient, defendant would need to identify a basis for exclusion. He failed to do so. Because counsel's efforts to suppress appellant's police statement were not deficient, appellant's second argument for ineffective assistance of counsel lacks merit.

## DISPOSITION

The judgment is affirmed.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.

12